## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Kristin Nicholas, et al.,

               Plaintiffs,

                            Case No. 1:20-cv-3688-MLB

v.

Fulton County School District,

               Defendant.

_____/

## **OPINION & ORDER**

Plaintiffs Kristin Nicholas, J.D., Wendy Bendit, T.B., I.B., and Georgia Association of Educators ("GAE") sued Defendant Fulton County School District ("FCSD") for equitable relief and damages challenging an agreement which allowed children to accompany their parents to work during the Covid-19 pandemic. Defendant now moves to dismiss for lack of subject matter jurisdiction and failure to state a claim. (Dkt. 33.) The Court grants that motion but allows Plaintiffs one final opportunity to amend certain allegations in their complaint as outlined below.

## I.   Background[1]

Plaintiff Nicholas is a special education teacher at Hopewell Middle School, a member of GAE, and Plaintiff J.D.'s parent.  (Dkt. 28 ¶ 1.) Plaintiff J.D. attends Hopewell Middle School, has been found eligible under the Individuals with Disabilities Education Act ("IDEA") as a child with autism, and is a qualified disabled student of school age under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504").  (*Id.*)  He has an individualized education plan ("IEP") under the IDEA.  (*Id.* ¶ 2.)

Plaintiff Bendit is a special education teacher at Cambridge High School, a member of GAE, and Plaintiffs I.B.'s and T.B.'s parent.  (*Id.* ¶ 3.)   Plaintiff T.B. attends Hopewell Middle School, has been found eligible under the IDEA as a child with a specific learning disability, is a qualified disabled student of school age under the ADA and Section 504, and has an IEP under the IDEA.  (*Id.* ¶¶ 3–4.)  Plaintiff I.B. attends

---

[1] Plaintiffs' complaint is often unclear, imprecise, and confusing, mostly because of unnecessary repetition and lack of precision.  The Court, with great frustration, has read and re-read it several times in an effort to understand it and do it justice.  To the extent the Court has failed to accurately divine Plaintiffs' intended meaning in any respect, the responsibility for that failure lies with Plaintiffs alone.

Cambridge High School and is a qualified disabled student of school age with Section 504 protections.  (*Id.* ¶ 3.)

Plaintiff GAE is a nonprofit membership organization whose members are employed by school systems throughout Georgia as public school teachers, counselors, and education support personnel.  (*Id.* ¶ 6.) Plaintiff "GAE's mission is to advance the teaching profession and the quality of public education throughout the State and to support, protect, and strengthen the education employees who nurture Georgia's children."  (*Id.*)  It provides training and support to members about their rights.  (*Id.*)  During the Covid-19 pandemic, its advocacy extended to specific and general concerns about the pandemic response, virtual learning, safety, and educators' rights and duties under their contracts. (*Id.*)

Defendant is a public school system and Plaintiffs Nicholas's and Bendit's employer.  (*Id.* ¶¶ 9–10.)  Defendant is a recipient of federal funds, a local education agency, and a public entity.  (*Id.* ¶ 10.)  Plaintiffs

Nicholas signed a contract with Defendant for the 2020–2021 school year. (*Id.* ¶ 22.)[2]

In July 2020, the Georgia Department of Education issued guidance as to how schools should modify operations as a result of the pandemic. (*Id.* ¶ 15.) The guidance "provide[d] a tiered approach with clear, actionable steps that [were] advisable before students and employees [could] return to school." (*Id.*) It was built upon recommendations from health officials, was strongly aligned to reopening guidelines provided by state and federal leaders, and was designed to help districts prioritize health and safety. (*Id.*) On July 23, 2020, Defendant's superintendent,

---

[2] Plaintiffs do not allege Plaintiff Bendit signed a contract for the 2020–21 school year. But, Plaintiffs apparently include her in their "violation" of contract claim. (Dkt. 28 ¶ 139.) At the same time, that claim seems to allege the unenforceability of the Agreement, rather than the violation or breach of any contract. Plaintiffs allege, for example, that the Agreement "negatively impacts the rights of non-parties to the employment relationship between Plaintiff[s] Nicholas and Bendit, and [Defendant] without any adequate consideration." (*Id.*) They also discuss the Georgia Code of Ethics for Educators and what that says about teacher resignations and claims the Agreement "exploits Plaintiffs' responsibilities as a parent (sic)." (*Id.* ¶¶ 141, 144.) This is but one example of the haziness of Plaintiffs' allegations. They should endeavor to speak clearly in their next amended complaint. At the very least, they must identify the precise contract they claim was "violated" or simply allege that the Agreement is an unenforceable contract—whatever their allegation entails. All the extra noise is unhelpful.

Mike Looney, provided an update to the Fulton County Board of Education explaining all students would be taught at the beginning of the school year via universal remote learning. (*Id.* ¶ 19.) During that time, Defendant required all "school-based personnel"—that is, teachers—to report to their work sites—that is, schools—to provide students remote instruction—that is, classes via Zoom. (*Id.* ¶ 20.)

At about the same time, Defendant decided to allow employees to bring their school-aged children into work with them. Mr. Looney sent a district-wide email to all employees, explaining that decision and attaching a document entitled "Waiver, Acknowledgment of Risk, Release of Liability and Indemnity" that employees wanting to bring their children to work had to sign before doing so. (Dkt. 28-1 at 1.)[3] The Agreement began by explaining that employees (including teachers) could bring their children into the school facilities during universal remote learning, "subject to the terms and conditions of the Agreement." (*Id.* at 2.) The Agreement then included a list of rules each employee and his or her child had to follow. This included, for example, requirements

---

[3] Plaintiffs refer to the document as a "Waiver" not the "Agreement." (Dkt. 28 ¶ 27.) The label placed on it is largely irrelevant. The Court refers to it as the "Agreement" because that it how it defined itself. (*Id.*)

that employees only bring their own children into a school, that employees remain solely responsible for the supervision of their children, that children and their employee-parent submit to daily temperature checks, that children remain with their parents (except for restroom breaks), and that children wear masks except when eating or drinking. (*Id.*)[4]  The Agreement next required employees to acknowledge the dangers of bringing children into a school facility during the Covid-19 pandemic and accept all liability for the risk that they or their children might contract Covid-19 while on-site.  (*Id.*)  It required employees to agree, on behalf of themselves and their children, to indemnify, defend, and hold harmless Defendant (and its employees) for any injury, damage, or loss they might suffer as a result of their presence at the schools.  (*Id.*) Specifically, the provision stated:

> Employee knowingly and voluntarily agrees on behalf of Employee and Child that should Employee or Child contract COVID-19 or any other illness, or incur any personal injury or any damage, loss or theft of property as a result of their presence at the FCS Facility, Employee will indemnify, defend and hold harmless FCS, its current, future or past officers, board members, employees, agents, volunteers, vendors, contractors, attorneys, insurers, and their respective

---

[4] Teachers not planning on having school aged children accompany them on-site only had to sign a guidance document with a pledge to follow basic safety guidelines to keep fellow employees safe.  (Dkt. 28 ¶ 25.)

heirs, successors and assigns (collectively, "FCS Parties") for any and all claims, suits, allegations, and damages, including but not limited to damages for medical expenses, injuries, and death, including claims for negligence. Employee further agrees not to file, nor cause to be filed, nor participate in, any lawsuit, claim, counterclaim, legal action or threat of legal action against the FCS Parties as a result Employee or Child contracting COVID-19 or any other illness, including claims for illness or injury, including death. If Employee takes any steps to make any claim(s) against any FCS Parties, Employee shall be obligated to pay all attorneys' fees and costs incurred by the FCS Parties as a result.

(*Id.*)    Importantly for this matter, the Agreement then required employees to agree on behalf of themselves and their children to waive and relinquish all claims "arising out of this Agreement." (*Id.*) This provision waives ***all*** claims but identified certain claims specifically. It states:

> Employee, on behalf of Employee and Child, knowingly and voluntarily waives and relinquishes all claims, including but not limited to claims . . . for discrimination arising under federal, state, and local statutory or common law, including Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the Individuals with Disabilities Education Act arising out of this Agreement. Further, despite Employee's retention of the right to file a charge with any governmental agency such as the Equal Employment Opportunity Commission (EEOC), Employee hereby waives the right to seek or recover monetary damages or other individual relief from FCS Parties in connection with any suit by Employee or in any suit brought on Employee's behalf by the EEOC. Employee shall be

7

responsible for all attorney's fees of FCS Parties in connection with any such action.

(*Id.* at 2–3.)  Finally, the Agreement concludes with an acknowledgment that it "shall survive the termination or expiration of the benefits conferred hereunder . . ." (*Id.*)  Defendant has not repealed the Agreement, although (as explained below) it has stopped using it.  (Dkt. 28 ¶ 82.)

On July 29, 2020, Plaintiff Nicholas received the Agreement and an email from her principal, Michael LeMoyne, stating, "If you think there is a chance that you will need to take advantage of this privilege at some point, I would encourage you to sign and return the waiver now." (*Id.* ¶ 36.)  Plaintiff Nicholas responded, raising concerns about Defendant's requirement that she waive personal rights to recover for injury, the waiver of her son's and her IDEA rights, and the difference in treatment between employees with school-aged children and those without.  (*Id.* ¶ 38.)  Principal LeMoyne—without engaging on the scope of the waiver— explained that, if Plaintiff Nicholas did not sign the Agreement, she could not bring her child into the school and, if that meant she could

not work, she would have to take leave.  (*Id.* ¶ 39.)  Plaintiff Nicholas did not want to sign the Agreement.[5]  (*Id.* ¶ 40.)

Sometime after that, Plaintiff GAE sent Mr. Looney a letter raising specific objections to the Agreement, including objection to the inclusion of a blanket waiver of any rights the employee may have, not only for Covid-19 related matters, but all claims under the federal civil rights statutes.  (*Id.* ¶¶ 43–44.)  Plaintiff GAE provided Defendant an annotated agreement that struck or amended certain provisions "to eliminate certain provisions and ensure the educational and civil rights of any children and parents remained intact."  (*Id.* ¶ 45.)  Plaintiff GAE offered to address the issues with Defendant, but Defendant never responded.  (*Id.*)

About a week later, Plaintiff Nicholas presented the GAE proposed agreement to Mr. LeMoyne, her principal, who rejected the submission without "the approval from the county."  (*Id.* ¶ 48.)  Plaintiff Nicholas also signed the GAE proposed agreement and sent it to Ronnie Wade and Mr. Looney with an email requesting they review the document and reply

---

[5] Teachers' pre-planning started on August 3, 2020 with remote instruction beginning on August 17, 2020.  (Dkt. 28 ¶ 21.)

with the county's acceptance of the amended document.  (*Id.* ¶ 49.)  Mr. Looney responded, saying the original agreement was a prerequisite for employees to bring children with them to work during universal remote learning.  (*Id.* ¶ 50.)

Plaintiff Nicholas returned to work without signing the Agreement. (*Id.* ¶ 51.)  Plaintiff J.D. thus had no one to supervise him while attending school remotely and often attended while in a car accompanying his stepfather on business trips.  (*Id.* ¶ 40.)

Plaintiff Bendit, on the other hand, signed the Agreement and brought her children to work.  (*Id.* ¶ 59.)  She had concerns about the scope of the Agreement but could not afford to stay out of work and her children, because of their disabilities, could not remain home alone.  (*Id.*) Plaintiffs T.B. and I.B. attended remote learning at school for two weeks after which special education students returned to the classroom.  (*Id.* ¶ 60.)  The school generally returned to in-person learning in October 2020.  (*Id.* ¶ 61.)

Plaintiff Bendit has participated in educational planning meetings for both her children since the school returned to normal.  (*Id.*)  She has raised concerns about the negative impact remote learning had on her

child (Plaintiff T.B.).  (*Id.*)  She believes Defendant should have provided compensatory education services to her child, but has not asserted her (or her child's) rights to those services because of the waiver in the Agreement.  She believes the Agreement prevents her from doing so and could subject her to paying Defendant's attorneys' fees if she raises such a claim.  (*Id.* ¶¶ 61–62.)  She explains "she is afraid and unable to exercise her rights under IDEA to seek an appropriate remedy . . . or any claims she may have under IDEA, ADA and Section 504" because of the Agreement.  (*Id.* ¶ 61.)

In October 2020, Plaintiff Nicholas received a letter from Defendant recognizing her child's right to be considered for compensatory services for virtual instruction but deferring such consideration to later IEP team discussions.  (*Id.* ¶ 63.)  During 2020–2021 and after mandatory virtual instruction, Plaintiffs Nicholas and J.D. found it necessary to come to school early for help sessions and complete work in a school environment. (*Id.* ¶ 66.)  In February 2021, Plaintiff J.D. had an annual review of his IEP.  (*Id.* ¶ 69.)  He was continued in special education, but his progress slowed and in some areas regressed.  (*Id.*)  Defendant also has not addressed his right to be considered for compensatory education.  (*Id.*)

Plaintiff J.D.'s loss of skills and failure to progress were not remediated during the 2020–2021 school year.  (*Id.* ¶ 70.)

As explained, Defendant generally stopped universal remote learning in October 2020.  Following the Christmas break, Defendant delayed in-person classes for one week as Covid-19 infection rates were increasing.  (*Id.* ¶ 67.)  At that time, Defendant identified that closures and additional virtual instruction requirements would be made on a school-by-school and case-by-case basis.  (*Id.*)  Defendant stated students kept out of school because of Covid-19 would receive asynchronous instructions with three hours of supplemental third-party tutoring.  (*Id.* ¶ 76.)  This generally meant students would be given assignments or packets to learn at their own schedule.  (*Id.*)

Plaintiffs sued asserting five counts against Defendant.  Count 1 claims Defendant violated the ADA and Section 504 because Defendant required educators with children with disabilities to relinquish their rights and their children's rights.  (*Id.* ¶¶ 94–124.)  The complaint alleges the Agreement singles out parents and children with disabilities and impacts them solely based on their impairments and status under disability laws.  (*Id.* ¶ 101.)  Plaintiff Nicholas seeks declaratory relief,

12

Plaintiffs Bendit and J.D. seek declaratory and injunctive relief as well as damages, and Plaintiffs T.B. and I.B. appear to seek injunctive relief. (*Id.* ¶¶ 110–11, 121, 124.)  Count 2 alleges Defendant violated Plaintiffs J.D., T.B., Nicholas, and Bendit's IDEA rights because the Agreement chills and burdens the free exercise of such rights.  (*Id.* ¶¶ 125–35.) Plaintiffs J.D., T.B., Nicholas, and Bendit seek declaratory relief and Plaintiff Bendit also seeks injunctive relief.  (*Id.* ¶ 135.)  Count 3 claims the Agreement is unenforceable as against public policy and provisions of IDEA, Title VII, the ADA, and Section 504 and Defendant breached its duty of good faith and fair dealing in the performance and enforcement of its employment contract with Plaintiff Nicholas and similarly situated teachers.  (*Id.* ¶¶ 136–47.)  Count 4 alleges Defendant violated the constitutional right to parent by conditioning and burdening a parenting choice about education.  (*Id.* ¶¶ 148–61.)  Plaintiffs seek declaratory and injunctive relief as well as damages.  (*Id.* ¶ 161.)  Count 5 claims Defendant violated Title VII by seeking a past and prospective waiver of Title VII rights and procedures without adequate consideration.  (*Id.* ¶¶ 162–69.)  Plaintiffs seek declaratory and injunctive relief as well as

damages.  (*Id.* ¶ 169.)  Defendant moves to dismiss for lack of subject matter jurisdiction and for failure to state a claim.  (Dkt. 33.)

## II.    Subject Matter Jurisdiction

### A.    Legal Standard

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint."  *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).  "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion."  *Id.* (internal quotations omitted).  "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered."  *Id.* (internal quotations omitted).

### B.    Discussion

"Article III of the Constitution limits federal courts to adjudicating actual 'cases' and 'controversies.'"  *A&M Gerber Chiropractic LLC*

*v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019). The doctrine of standing "constitutes the core of Article III's case-or-controversy requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998); *see A&M Gerber Chiropractic*, 925 F.3d at 1210 ("Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing."). To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Standing cannot be waived or conceded by the parties, and it may be raised (even by the court *sua sponte*) at any stage of the case." *A&M Gerber Chiropractic*, 925 F.3d at 1210. Courts "have always insisted on strict compliance with [the] jurisdictional standing requirement." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Defendant contends Plaintiffs lack individual and organizational standing to assert many of their claims. (Dkt. 33-1 at 4–15.)

### 1.   Plaintiffs Nicholas's and J.D.'s Equitable Claims

Plaintiffs seek declaratory relief, specifically a declaration that the Agreement violates the ADA, Section 504, IDEA, their constitutional rights as parents, various contractual rights, and Title VII.  They also seek an injunction precluding Defendant from relying upon the Agreement or otherwise requiring employees to waive their employment and other rights in order to bring their children into the school.

Defendant argues Plaintiffs Nicholas and J.D. lack standing to assert their equitable claims because those claims have become moot.[6] (*Id.* at 5–7.)  The mootness doctrine asks whether the issues in play at the outset of the controversy remain alive during the proceeding.  It "ensures that a justiciable case or controversy is present 'at all stages of review.'"  *Gagliardi v. TJCV Land Trust*, 889 F.3d 728, 732 (11th Cir. 2018); *see also Arizonans for Off. English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time

---

[6] Defendant does not raise this argument as to Plaintiffs Bendit, I.B., and T.B.  Rather, Defendant contends those Plaintiffs lack standing because they have not alleged a concrete injury.  (Dkt. 33-1 at 10–12.)  The Court addresses that argument below.

the complaint is filed."). The Eleventh Circuit has explained the relationship between mootness and a court's subject matter jurisdiction this way:

> Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of "Cases" and "Controversies." . . . [A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and must be dismissed.

*Id.* So, "to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1284 (11th Cir. 2012) (citation omitted). "If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to afford the plaintiff . . . meaningful relief, then the case becomes moot and must be dismissed." *De La Teja v. United States*, 321 F.3d 1357, 1362 (11th Cir. 2003).

"Despite this general rule, a party cannot necessarily moot a case for [equitable] relief by simply voluntarily agreeing to stop the allegedly

[challenged] conduct." *Keister v. Bell*, 29 F.4th 1239, 1250 (11th Cir. Mar. 25, 2022); *see Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282–83 (11th Cir. 2044).  The so-called "voluntary cessation exception" seeks to prevent defendants from returning to their old ways while skirting judicial review.  *See Keister*, 29 F.4th at 1250.  But the doctrine does not apply when there is "no reasonable expectation that the voluntarily ceased activity will, in fact, actually recur after the termination of the suit."  *Troiano*, 382 F.3d at 1283.

"Government defendants receive the benefit of the doubt in voluntary-cessation cases: When they voluntarily stop the challenged conduct, a rebuttable presumption arises that they will not reengage in it."  *Keister*, 29 F.4th at 1250.  The Eleventh Circuit has held that so long as a "policy has been 'unambiguously terminated,' any challenge to it is moot, unless a plaintiff identifies a 'reasonable basis to believe that the policy will be reinstated if the suit is terminated.'"  *Id.* (quoting *Troiano*, 382 F.3d at 1285); *Doe v. Wooten*, 747 F.3d 1317, 1323 (11th Cir. 2014) (to obtain the benefit of the rebuttable presumption, the government defendant bears the initial burden to show the offending policy has been unambiguously terminated); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of*

18

*Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) ("[A] challenge to government conduct that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the government conduct will resume if the suit is terminated").

> In *Flannigan's*, [the Eleventh Circuit] explained that, in determining whether a plaintiff has shouldered its burden, a reviewing court should look to "three broad factors"— although [the court] hastened to add that "these factors should not be viewed as exclusive nor should any single factor be viewed as dispositive," and that, in any event, "a mootness finding should follow when the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact" the challenged policy.

*Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1268 (11th Cir. 2020) (quoting *Flannigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1256 (11th Cir. 2017) (en banc)).   First, the court asks "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction." *Flannigan's*, 868 F.3d at 1257.   Courts "will examine the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it." *Id.*   Second, the court asks "whether the government's decision to terminate the challenged conduct

was 'unambiguous'"—which entails an inquiry into whether the government's policy shift is fairly viewed as being "permanent and complete."  *Id.*  Third, the court asks "whether the government has consistently maintained its commitment to the new policy."  *Id.*

Defendant says Plaintiffs Nicholas's and J.D.'s equitable claims are moot because it has ended remote learning and, if it ever goes back to that practice, it will ***not*** allow employees to bring their children into the schools.  It says these voluntary decisions obviate any future use of the Agreement, thus ending any controversy as to its legitimacy.  To support its argument, Defendant provided an affidavit of Cliff Jones, its Chief Academic Officer responsible for curriculum, instruction, and support services throughout the district.[7]  He says Defendant stopped providing

---

[7] "Even at the motion to dismiss stage, a defendant may bring a 'factual attack' on a plaintiff's standing, which 'challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony.'"  *Tokyo Gwinnett, LLC v. Gwinnett Cnty., Ga.*, 940 F.3d 1254, 1265 (11th Cir. 2019) (quoting *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.2d 1229, 1233 (11th Cir. 2008)); *see also Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013) (at the motion to dismiss stage when a defendant mounts a factual attack to standing, a court can "consider extrinsic evidence such as deposition testimony and affidavits" and is not "constrained to view [the facts] in the light most favorable to the plaintiff"); *but cf. Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.

waivers to teachers and stopped accepting newly executed waivers in late September 2020 when it began expanding in-person learning and stopped allowing employees to bring their children to work with them.  (Dkt. 33-2 ¶ 10.)  He explains that, even when the school district returned to virtual learning for two weeks in January 2021 because of a spike in Covid-19 infection rates, Defendant did not permit employees to bring their children to work or require them to sign a waiver to do so.  (*Id.* ¶¶ 10, 12.)  He unequivocally states that Defendant "does not intend to reimplement [that] practice again."  (*Id.* ¶ 17.)  And, finally, he explains that a newly enacted guidebook Defendant provided to teachers for instructions on how to deliver lessons to children during the pandemic entitled a "Returning to Face to Face Instruction for School Year 21/22" states that, in the event Defendant has to close one or more schools, "employees may be required to report to their work site," but "their children will not be permitted in workspaces."  (*Id.* ¶¶ 18–19.)

---

1990) (when the factual attack is "inextricably intertwined" with the merits of the lawsuit, "[t]he proper course of action . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case").

Defendant has shown it voluntarily and unambiguously terminated the allegedly wrongful conduct and Plaintiffs have not identified a reasonable basis to believe Defendant will reinstate the policy if Plaintiffs' claims are dismissed.  Several undisputed facts support this determination.  First, the challenged policy was adopted over a short period of time during an unprecedented pandemic.  In July 2020 as the pandemic threatened the reopening of schools, the Georgia Department of Education issued guidance to all school districts.  (Dkts. 28 ¶ 15; 28-1.) It included a recommendation that districts consider temporary closure, prepare for remote learning, and consider reporting requirements for staff during closures.  (Dkt. 28-1 at 5–10.)  On July 23, 2020, Mr. Looney announced that all students would be taught via universal remote learning due to the resurgence of Covid-19 infections.  (*Id.* ¶ 19.)[8]  About six days later, Defendant told its employees they could bring their school-aged children into work subject to the terms of the Agreement.  (*Id.* ¶ 24.)

---

[8] Plaintiffs contend Defendant took this action based on the Department of Education's guidance.  (Dkt. 28 ¶ 19.)  But the guidance is dated July 30, 2020, about a week after Mr. Looney's announcement.  The chronology, however, really does not matter.  The relevant point is that this was all happening in a short period of time and in response to an unprecedented situation.

That all of this happened in less than a month and in a new environment dominated by Covid-19 supports Defendant's contention that its use of the Agreement was temporary, has ended, and is not part of its practices going forward.

Second, the policy was in effect for less than two months. Defendant presented the Agreement to employees/parents on July 29, 2020. (*Id.* ¶¶ 24, 36.) Pre-planning started on August 3, 2020 with remote instruction beginning on August 17, 2020. (*Id.* ¶ 21.) Mr. Jones testified that, on September 8, 2020, Defendant began the first phase of its reopening plan, transitioning to in-person instruction. (Dkt. 33-2 at 3.) By the end of September 2020, Defendant stopped allowing its employees to bring their children to work, stopped providing the Agreement, and stopped accepting newly executed Agreements. (*Id.*) On October 14, 2020, Defendant returned to face-to-face instruction five days a week. (*Id.*) Defendant has not used the Agreement since then. The temporary nature of the policy shows the agreement simply arose because Defendant was trying to navigate a pandemic. None of this suggests the practice is likely to arise again.

23

Third, there was a natural end to the policy with the reopening of schools.  The Court notes the timing of Defendant's actions may suggest a desire to eliminate potential liability.  Plaintiffs filed their complaint on September 4, 2020. (Dkt. 1.)  Defendant stopped using the Agreement by the end of September 2020—after Plaintiffs sued.  But the change was not "late in the game" since nothing had occurred in this litigation.  And timing considerations should not be overemphasized in the voluntary-cessation analysis as "jurisdiction-manipulation is only one among several non-exhaustive factors that inform the inquiry." *Keohane*, 952 F.3d at 1271.  There is also no indication Defendant's conduct sought to manipulate the Court's jurisdiction.  Rather, it was the natural result of more people being allowed in schools.  Mr. Jones testified "[b]y the end of September 2020, *because of* the expansion of in-person instruction, [Defendant] stopped allowing school-based employees to bring their children to work with them." (Dkt. 33-2 ¶ 10 (emphasis added).)

Fourth, Defendant has not reimplemented the Agreement even though there have been other disruptions to in-person schooling.  Again, since the end of September 2020, Defendant has neither permitted its employees to bring their children to work nor asked them to sign an

agreement to do so.  (Dkt. 28 at 4.)  And again, even in January 2022, when Defendant delayed its return from winter break for one week, it did not permit employees to bring their children to work or use the Agreement.  (Dkts. 39-2 ¶¶ 2–5; 39-3 ¶¶ 2–4, 6; 40 at 10.)  Mr. Jones also testified that Defendant "does not intend to" permit its employees to bring their children to work with them or ask employees to sign an agreement to do so.  (Dkt. 33-2 at 4.)  This suggests the Defendant's cessation is a fixed part of its plan going forward.  *See Beta Upsilon Chi Upsilon Chapter of Univ. of Fla. v. Machen*, 586 F.3d 908, 917 (11th Cir. 2009) (finding plaintiff could not overcome the presumption that the objectionable behavior would not recur in part because defendant had modified the policy in its handbook and stated its intention to adhere to the modified policies).

Finally, Defendant issued the 21/22 handbook which states that "[i]n the event of a site, zone, or District closure, employees may be required to report to their work site," but "their children will not be permitted in workspaces."  (Dkt. 33-2 at 4–5.)  That Defendant has implemented a new policy that expressly rejects the circumstance giving rise to the Agreement, supports its contention that it has abandoned the

Agreement going forward. *See Keohane*, 952 F.3d at 1269 ("[T]he [defendant] has not merely declined to enforce the [policy] against [the plaintiff] in particular—so as, in effect, to give her a personalized exemption. Rather, it has removed the challenged portion of the policy in its entirety. Indeed, the [defendant] has gone a step farther by replacing the old . . . policy with a new protocol that provides for individualized evaluation." (quotations and citations omitted)).

Against all of this, Plaintiffs merely note that the 21/22 handbook contains a provision stating, "the District reserves the right to change its protocols outlined in this handbook as needed. This handbook does not create a contract or guarantee of any kind." (Dkt. 33-2 at 7.)   Plaintiffs suggest this means Defendant could reimplement its use of the Agreement in the future.  The mere possibility that a government entity, having voluntarily ended a challenged practice, could possibly reinstitute the practice is not enough to create a case or controversy.  Instead the inquiry is whether the entity "unambiguously terminated" the practice and whether there is any "reasonable basis" to believe it will restart the practice after the lawsuit ends. *Keister*, 29 F.4th at 1250.  Defendant has shown the former.  And, in the light of the unprecedented nature of the

pandemic, the temporary nature of Defendant's use of the Agreement, its

real-time cessation of the conduct, and its documented decision not to use

it in the future, Plaintiffs have failed to show the latter.

The Court finds Plaintiffs Nicholas's and J.D.'s challenges to

Defendant's former Agreement are moot and dismisses their claims for

injunctive and declaratory relief.[9]

### 2.    The Individual Plaintiffs' Injury Allegations

Defendant next argues none of the individual Plaintiffs have

alleged an injury in fact.  (Dkt. 33-1 at 7–12.)

> [T]o satisfy Article III's standing requirements, a plaintiff
> must show (1) it has suffered an injury in fact that is
> (a) concrete and particularized and (b) actual or imminent,
> not conjectural or hypothetical; (2) the injury is fairly
> traceable to the challenged action of the defendant; and (3) it

---

[9] If Defendant were to reimplement the practices of allowing employees
to bring their children to work or asking employees to sign an Agreement
to do so, Plaintiffs Nicholas and J.D. would be free to reinstate their suit.
The Eleventh Circuit has made clear

> If [a defendant] choose[s] to reinstate [its] restrictive
> policies—or adopt similar ones—the courthouse door is open
> to [plaintiff] to reinstate its lawsuit. Under such
> circumstances, the case would not be moot even if the
> [defendant] again revoked its policies in response to the
> lawsuit, because such "flip-flopping" would create a
> reasonable expectation that the [defendant] would reinstate
> the challenged practice at the close of the lawsuit.

*Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.*, 162 F.3d 627,
630 (11th Cir. 1998).

is likely, as opposed to merely speculative, that the injury will
be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S.
167, 180–81 (2000).  "The plaintiff bears the burden of establishing each
element."  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1268 (11th Cir.
2019).  And plaintiff must meet that burden "for each claim he seeks to
press and for each form of relief that is sought."  *Town of Chester v. Laroe
Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

Courts "should not speculate concerning the existence of standing,
nor should [they] imagine or piece together an injury sufficient to give
plaintiff standing when it has demonstrated none."  *Bochese v. Town of
Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005).  In other words, "[i]t is
not enough that [plaintiff] sets forth facts from which [the court] could
*imagine* an injury sufficient to satisfy Article III's standing
requirements."  *Id.*  Instead, "plaintiff has the burden to clearly and
specifically set forth facts sufficient to satisfy Art. III standing
requirements."  *Id.*; *see Spokeo*, 578 U.S. at 338 ("[A]t the pleading stage,
the plaintiff must clearly allege facts demonstrating each element [of
standing]." (internal quotations omitted)).  "If the plaintiff fails to meet

its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Bochese*, 405 F.3d at 976.

Injury in fact is "the first and foremost of standing's three elements." *Spokeo*, 578 U.S. at 339 (internal quotations omitted). When a plaintiff seeks damages, courts consider whether a past harm has occurred. *Sierra v. City of Hallandale Beach Fla.*, 996 F.3d 1110, 1113 (11th Cir. 2021). "When a plaintiff seeks prospective relief to prevent a future injury, it must establish that the threatened injury is certainly impending." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1280 (11th Cir. 2020); *see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (same); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) ("[A] threatened injury must be *certainly impending* to constitute injury in fact."); *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) ("[A] prayer for injunctive and declaratory relief requires an assessment, at this stage in the proceeding, of whether the plaintiff has sufficiently shown a real and immediate threat of future harm."). "[A]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409. Nor is a "realistic threat," *Summers v. Earth Island Inst.*, 555 U.S. 488, 499–500 (2009), an "objectively reasonable likelihood" of

harm, *Clapper*, 568 U.S. at 410, or "a 'perhaps' or 'maybe' chance" of injury, *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000). The Supreme Court has said that literal certainty is not "uniformly require[d]," and that a "*substantial* risk" or "*substantial* likelihood" of harm may be enough "[i]n some instances." *Clapper*, 568 U.S. at 414 n.5 (emphasis added); *Bowen*, 233 F.3d at 1340 (emphasis added). The required showing is ultimately "a matter of degree," *Thompson v. State Farm Fire & Cas. Co.*, No. 5:14-CV-32, 2016 WL 2930958, at *2 (M.D. Ga. May 19, 2016), and "[h]ow likely is enough is necessarily a qualitative judgment," *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008).

When standing is questioned at the pleading stage, as it is here, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citations and internal marks omitted). In the context of a Rule 12(b)(1) challenge to standing, courts "are obliged to consider not only the pleadings, but to examine the record as a whole to determine whether [they] are empowered to adjudicate the

matter at hand." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003).

### a)   Agreement Interpretation

Defendant first contends Plaintiffs' entire lawsuit rests on an incorrect reading of the Agreement. (Dkt. 33-1 at 8–9.)  As explained, in exchange for bringing his or her child into a school building during universal remote learning an employee had to waive "all claims, including but not limited to claims . . . for discrimination arising under federal, state, and local statutory or common law, including Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the Individuals with Disabilities Education Act arising out of this Agreement."  (Dkt. 28-1 at 2–3.) Defendant contends the language "arising out of this Agreement" limits the Agreement to claims that "arose specifically because students were in a school building during [Defendant's] temporary district-wide closure." (Dkt. 33-1 at 9.)  It insists it is not a "wholesale forfeiture of Plaintiffs' rights under federal law." (*Id.*)

Plaintiffs, on the other hand, claim that the Agreement is much broader and required teacher/parents to waive all current and future

claims they or their children may have against Defendant.  Specifically, Plaintiffs allege that the Agreement "prospectively eliminates claims and rights under the IDEA, Title VII and discrimination based on disability which have already accrued, and which may accrue" totally unrelated to the parent/employee's decision to bring his or her child into the school during remote learning.  (Dkts. 28 ¶¶ 28, 35, 90, 91, 99.)  To emphasize their reading of the Agreement, Plaintiff Bendit claims Defendant failed to provide required, compensatory education services to her child—which obviously has nothing to do with anything that occurred while her child accompanied her to work—but the Agreement prevents her from asserting her child's rights under IDEA.  (*Id.* ¶ 61.)  She specifically claims the Agreement prevents her from asserting her child's right to a free appropriate public education ("FAPE").  (*Id.* ¶ 62.)  In response to Defendant's motion to dismiss and assertion as to the limited scope of the Agreement, Plaintiffs continue to insist that the Agreement "language shows a breadth and depth that exceeds far beyond claims arising from a child's presence in a school building."  (Dkt. 36 at 10.)

This case thus presents a strange situation in which Plaintiffs insist they have given up certain rights that they would like to exercise

while Defendant insists they have not and are free to exercise those rights. The central rule of contract interpretation is to find the parties' intent. O.C.G.A. § 13-2-3 ("The cardinal rule of construction is to ascertain the intention of the parties."). When interpreting a contract under Georgia law, a court must first "decide whether the language is clear and unambiguous." *CareAmerica, Inc. v. S. Care Corp.*, 494 S.E.2d 720, 722 (Ga. Ct. App. 1997). "If it is, the court simply enforces the contract according to its clear terms." *Id.* When the language of a contract is plain and unambiguous, no additional construction is required or permissible and "the terms of the contract must be given an interpretation of ordinary significance." *Fernandes v. Manugistics Atlanta, Inc.*, 582 S.E.2d 499, 502 (Ga. Ct. App. 2003). If the contract is ambiguous in some respect, however, a court "must apply the rules of contract construction to resolve the ambiguity." *CareAmerica*, 494 S.E.2d at 722; *see also Blueshift, Inc. v. Advanced Computing Techs., Inc.*, 616 S.E.2d 816, 819 (Ga. Ct. App. 2005) (the court may not look to rules of construction when the terms have a clear and plain meaning). "[I]f the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended

must be resolved by a jury." *CareAmerica*, 494 S.E.2d at 722. "The construction of a contract is a question of law for the courts, as is the existence or nonexistence of an ambiguity in a contract." *Avion Sys., Inc. v. Thompson,* 666 S.E.2d 464, 467 (Ga. Ct. App. 2008) (internal citations omitted).

The Agreement is clear and unambiguous. It has two distinct provisions—the first releasing all claims arising from the employee or a child contracting Covid-19 or suffering any other injury or damage as a result of their presence at a school facility and the second relinquishing all other claims (including claims under employment, disability, and education laws) arising from the child's presence. Plaintiffs' complaint focuses on the second. (Dkt. 28 ¶ 27.) It expressly states that the employee only waives and relinquishes claims "arising out of this Agreement." (Dkt. 28-1 at 2.) Plaintiffs' contention that the provision is not tied to whether a child was in school ignores the plain reading of the document. The second paragraph of the Agreement clearly states an employee only waives civil rights and education claims *arising out of the Agreement*. The Agreement is the document that allowed employees/parents to bring their children to work with them during

universal remote learning. The Agreement is thus clearly limited in scope to claims that arose because children were in a school building during Defendant's closure. *See Milsap v. Cornerstone Residential Mgmt., Inc.*, No. 05-60033, 2007 WL 965590, at *4 (S.D. Fla. March 28, 2007) (arbitration clause covering "any controversy or claim arising out of this Agreement" refers only to disputes "relating to the interpretation and performance of the contract itself" (citing *Tracer Rsch. Corp. v. Nat'l Environmental Services Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994))). Claims that arose under IDEA or Title VII before or after universal remote learn—or otherwise apart from the child's presence in the school with a parent—certainly could not be considered to have arisen "out of the Agreement."

The fallacy of Plaintiffs' interpretation is best exemplified by three exaggerations or fictions they use to push their expansive reading of the Agreement. First, Plaintiffs argue the Agreement is a "[c]omplete and total release and waiver of all claims for discrimination, ***existing or future***, 'arising out of this Agreement.'" (Dkt. 36 at 11 (emphasis added).) Plaintiffs use the terms "existing or future" to support their argument that the Agreement required employees to waive claims that

had accrued before remote learning started or after it ended—that is, not just those that arose during remote learning as a result of bringing children into the school building. (*Id.*) But, the terms "existing or future" do not appear anywhere in the Agreement. Plaintiffs insert these words to exaggerate the scope of the waiver. Second, Plaintiffs claim the Agreement includes a "survival term that extends the waiver past the termination of the benefit, making this Agreement a waiver of all claims accrued **during and after** it terminates the benefit." (*Id.* at 12 (emphasis in original).) Again, Plaintiffs use the terms "**during and after**" to suggest the Agreement covers claims accruing after an employee stopped bringing his or her children into the school building. But, again those terms do not exist in the survival clause, which simply says that the Agreement survives the termination of the benefits conferred, meaning the waivers contained therein remain. (Dkt. 28-1 at 3.) Third, Plaintiffs contend Defendant's interpretation of the Agreement cannot be believed because, at the start of remote learning, Defendant rejected GAE's annotated waiver "that track[ed] Defendant's newly stated position" and interpretation of the Agreement. (Dkt. 36 at 10.) But that also is not true. The GAE annotated waiver completely struck

the waiver paragraph at issue.  (Dkt. 28-1 at 49-50.)  Plaintiffs did not seek to clarify the waiver covered only claims (including discrimination and educational claims) as a result of children accompanying parents into school buildings.  Plaintiffs' argument that GAE proffered and Defendant rejected the interpretation Defendant puts forth in its motion to dismiss is simply untrue.[10]  That Plaintiffs rely on these misstatements to support their interpretation of the Agreement demonstrate the gulf between their interpretation and the plain language of the Agreement.

Any alleged injury arising out of Plaintiffs' overly broad interpretation cannot support standing.

---

[10] For some reason, Plaintiffs also continue to mischaracterize (or perhaps misunderstand) Defendant's proposed interpretation of the Agreement.  They say Defendant now contends the Agreement "is only for Covid-related claims" and "does not apply to non-Covid-19 claims." (Dkt. 36.)  But that is not what Defendant says.  It says the relevant paragraph of the Agreement is limited "to claims that arose specifically because students were in a school building during [Defendant's] temporary district wide closure." (Dkt. 33-1 at 8.)  They clarify that the first paragraph of the Agreement pertains to Covid-related claims from a child's presence and the second pertains to all other (i.e., non-Covid-related claims, including education and discrimination claims) arising from the child's presence.  (*Id.*)  Plaintiffs do not advance their case by continually mischaracterizing undisputed facts.

### b)   Plaintiff's Nicholas and J.D.

Defendant also contends that, since Plaintiff Nicholas did not sign the Agreement, neither she nor Plaintiff J.D. have pled an injury that could entitle them to compensatory damages.   (Dkt. 33-1 at 9–10.) Plaintiff Nicholas argues she suffered harm in the form of (1) losing actual legal protections that other educators still possess because of her forced waiver; (2) being treated differently by Defendant on the basis of her son's disability; and (3) being denied her constitutional right to parent. (Dkt. 36 at 15.)  Plaintiffs also allege Defendant injured Plaintiff J.D. by "imposing an overbroad waiver upon his mother that [] result[ed] in him being denied a benefit that non-disabled students can receive." (Dkt. 36 at 15–16.)

As to the first, Plaintiff Nicholas claims she lost protections because of a forced waiver, but she was not forced to the sign the Agreement and never signed it.   Defendant did not require educators to sign the Agreement, as evidenced by Plaintiff Nicholas's continued employment. (Dkt. 28 ¶ 1.)  Signing the Agreement merely provided employees a benefit.  In addition, Plaintiff's reference to losing "actual protections other educators still possess seems" to be a reference to Plaintiffs'

overbroad reading of the Agreement. As explained, Plaintiff Nicholas has not lost any rights to demand a FAPE or otherwise assert her or her child's right to the protections of education and anti-discrimination laws. And every parent who brought their children into school buildings at the time waived the same right. Those—like Plaintiff Nicholas—who did not bring their children to work with them did not sign the Agreement but also could not have a claim based on their child's presence in a school building. There is simply no injury here.

As to the second, Plaintiff Nicholas alleges Defendant discriminated against her in regard to fringe benefits of employment based on her son's disability. Under the ADA,

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Under the EEOC's regulation interpreting the ADA, "[i]t is unlawful for a covered entity to discriminate on the basis of disability against a qualified individual in regard to: . . . [f]ringe benefits available by virtue of employment." 29 C.F.R. § 1630.4(a); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844–

45 (1984) (courts defer to federal agency's reasonable interpretation of a law that Congress has given it authority to administer).

Plaintiff Nicholas alleges Defendant distinguished between teachers with children with disabilities and teachers with children who did not receive services under the IDEA. (Dkt. 28 ¶ 54.) Plaintiff Nicholas appears to argue the Agreement does not adversely impact educators whose children are not disabled because the Agreement does not require them to relinquish rights guaranteed to them or their children. This is incorrect. The Agreement requires everyone who signs it to waive all claims arising from the child's presence during remote learning. The Court agrees certain individuals may have more or different rights than other individuals, but the Agreement applies to everyone. Plaintiffs' misinterpretation of the Agreement has led to confusion as to all of their arguments. At this stage, the Court will allow Plaintiffs to reallege their ADA and Section 504 discrimination claims. But Plaintiffs may only reallege such claims if they believe they have a claim because the Agreement included relinquishment of IDEA and discrimination claims *from a child's presence on campus during remote learning*—that is, based on the Court's interpretation of the Agreement.

They may not bring any claim based upon their overly broad reading of the Agreement.[11]

As to the third alleged injury, Plaintiff Nicholas claims Defendant's insistence on a signed Agreement as a condition of bringing her child to work, impinged on Plaintiffs Nicholas's and Bendit's constitutional right to parent their children. (Dkt. 28 at ¶¶148-161.) Plaintiff Nicholas alleges the Agreement does this by conditioning a parenting choice about education on the need to return to work, stripping away the protected rights of the parent and child, and imposing a burden on parents who need to return to work to support their families. (*Id.* ¶ 153.) Plaintiffs Nicholas and Bendit allege their rights to make decisions about the education of their children have been unnecessarily and illegally limited by Defendant and its insistence on obtaining a blanket waiver. (*Id.* ¶ 160.)

The right to parent includes the authority "to direct the upbringing and education of children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Supreme Court precedent recognizes parental liberty entitles parents to

---

[11] Likewise, and for the reasons already explained, Plaintiff may not reallege any claim based upon their unsupported fear Defendant may require teachers to sign the Agreement in the future.

teach their child a foreign language, *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923); to enroll their child in a private school, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925); and to withdraw their high-school-aged child from school to provide vocational training, *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972). Those cases all involve the state placing restrictions on *children's education*. That is not what happened here. The Agreement at issue here is about employment benefits of teachers. According to Plaintiffs, Defendant's insistence on the Agreement as a condition to bringing children into the school buildings left them with three choices: (1) come to work and leave their children at home; (2) come to work and bring their children; or (3) take personal leave and stay home with their children. These choices relate to Plaintiffs' employment benefits, not their children's education. Plaintiffs' allegations of a constitutional violation are thus insufficient for Article III standing.[12]

---

[12] The Court notes Defendant can control who may enter its premises. *See Woodbury v. City of Tampa Police Dep't.*, No. 8:10-CV-0772, 2010 WL 2557677, at *2 (M.D. Fla. June 8, 2010) ("[C]ourts have consistently upheld the authority of school officials to control activities on school property. This includes barring third parties . . . from access to the premises when necessary to maintain order and prevent disruptions to

Plaintiff Nicholas contends Defendant caused harm to her son, Plaintiff J.D., by "imposing an overbroad waiver upon his mother that would result in him being denied a benefit that non-disabled students can receive." (Dkt. 36 at 15–16.) It seems Plaintiff J.D. alleges that, because of Defendant's Agreement requirement and his mother's refusal to sign it, he was not allowed to be with his mother and thus received instruction without the stability of an appropriate learning environment. (Dkt. 28 ¶¶ 40–42.) Defendant contends it had no obligation to provide Plaintiff J.D. access to the building or to provide other childcare, that his mother decided not to sign the Agreement, and that it is not to blame for the setting in which J.D. received online instruction. (Dkt. 33-1 at 10.) Traceability requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel*, 523 U.S. at 103. A "showing of proximate cause" is unnecessary. *Resnick*

---

the educational environment." (internal citation omitted)); *Cole v. Buchanan Cnty. Sch. Bd.*, 328 F. App'x 204, 209 (4th Cir. 2009) ("A school board . . . has inherent authority to restrict access to the property that it controls. . . . Members of the public do not have any constitutional right of access to public schools."). As noted above, Plaintiffs' complaint is hard to decipher, but if Plaintiffs contend they were harmed because Defendant prohibited certain individuals from entering their premises, that likely would not be an Article III injury.

*v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012).  "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement."  *Id.*  But the injury cannot "result [from] the independent action of some third party not before the court."  *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011).  And traceability does not exist where "an independent source would have caused [plaintiff] to suffer the same injury."  *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012).

The Court shares Defendant's traceability concerns.  It seems any impact Plaintiff J.D. felt resulted from his mother's decision not to sign the Agreement.  But, he also claims he was somehow denied the same rights and opportunities afforded other students as a result of his disability.  (Dkt. 28 ¶ 113.)  It is difficult to fully assess Plaintiff J.D.'s claims as it appears Plaintiffs' overly broad interpretation of the Agreement has created confusion as to the actual injury alleged.  The Court will thus allow Plaintiff J.D. to reallege his claims to the extent he believes he suffered some injury as a result of the Agreement requiring him to waive IDEA, ADA, or Rehabilitation Act claims arising from his presence on campus.  The Court offers no opinion as to whether the

Agreement allows for any such claims, but if it does, the causes of action are limited to the relinquishment of rights to bring discrimination claims based on a child's presence on campus during remote learning.

### c) Plaintiffs Bendit, T.B., and I.B.

Defendant argues Plaintiffs Bendit, T.B., and I.B. have not alleged a concrete injury because they seek relief based on the bare allegation that the Agreement has chilled their exercise of statutory rights.  (Dkt. 33-1 at 10–12.)  Plaintiffs, however, contend the harm was the loss of the substantive entitlements and of the procedures to protect them.  (Dkts. 36 at 15; 28 ¶ 28.)  Plaintiff Bendit argues she cannot effectively dispute Defendant's decisions about her children's educational needs.  (Dkt. 28 ¶ 107.)  Plaintiffs allege the Agreement creates the continuing impact of anger and regret for Plaintiff Bendit who felt compelled to sign the Agreement.  (*Id.* ¶ 90.)  Plaintiff Bendit felt the Agreement isolated her as a parent of children with disabilities and caused great stress and fear. (*Id.* ¶ 108.)  Plaintiffs thus do not argue the injury was a chilling effect. Rather, they allege the injury was the relinquishment of rights and how the Agreement made them feel.

But Plaintiff Bendit's allegations about the injury are premised on her misunderstanding of the Agreement.  As explained above, everyone had to waive all of their claims that arose while children were on campus during remote learning.  That is what Plaintiffs must focus on moving forward.  There is so much confusion in the complaint and briefing because of Plaintiffs' misunderstanding of the scope of the Agreement. The Court will allow Plaintiffs to reallege their claims as to Plaintiffs Bendit, T.B., and I.B.'s past injuries but only within the confines of the Court's interpretation of the Agreement.

Plaintiffs Bendit, T.B., and I.B., however, have not satisfied Article III as to their claims for prospective declaratory and injunctive relief.  As explained in regards to Plaintiffs Nicholas's and J.D.'s equitable claims, "when a plaintiff seeks prospective relief to prevent a future injury," he or she "must establish that the threatened injury is certainly impending." *Indep. Party of Fla.*, 967 F.3d at 1280.  Plaintiffs Bendit, T.B., and I.B.'s alleged future injuries are not certainly impending, so they lack standing to obtain the prospective relief they seek.   First, these Plaintiffs prospective injuries are based on an incorrect reading of the Agreement. Plaintiffs argue they can never access the IDEA dispute resolution

process or file administrative complaints or sue under Section 504 or the ADA, but all those arguments are based on an incorrect interpretation of the Agreement.  As discussed above, the Agreement is limited in scope to claims that arose because children were in a school building during Defendant's closure.  The alleged future harms are thus nonexistent. Second, even if the Agreement were a wholesale forfeiture of federal rights, any future harm is speculative.  Plaintiffs do not allege they attempted any of these actions and were then met with the Agreement. Nor do they allege they want to take any such action imminently.  In fact, Plaintiffs filed this case and Defendant has not raised the Agreement as a defense.  If Defendant invokes the Agreement in the future, Plaintiffs Bendit, T.B., and I.B. can then contest it but, at this time, these Plaintiffs lack standing to obtain prospective equitable relief.[13]

### 3.    Organizational Standing

Defendant finally contends Plaintiff GAE cannot meet the criteria for organizational standing.  (Dkt. 33-1 at 12–15.)  An organization can

---

[13] To the extent Plaintiffs Bendit, T.B., and I.B. are challenging a possible reimplementation of the Agreement or being required to make a future choice regarding the Agreement, those claims are moot because of Defendant's voluntary cessation, as discussed above.

have standing under a diversion-of-resources theory, an associational standing theory, or both. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

"Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Id.*; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("[C]oncrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). To establish standing, an organizational plaintiff must explain *what activities* it would divert resources away *from* to spend resources on combatting the alleged illegal act. *See Jacobson*, 974 F.3d at 1250; *see also Browning*, 522 F.3d at 1166 ("These resources would otherwise be spent on registration drives and election-day education and monitoring."); *Ga. Latino All. for Hum. Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (observing that an immigration organization "cancelled citizenship classes to focus on" increased inquiries about a new law).

Plaintiff GAE's mission "is to advance the teaching profession and the quality of public education throughout the [s]tate and to support, protect, and strengthen the education employees who nurture Georgia's children." (Dkt. 28 ¶ 6.)  Plaintiff GAE provides training, support, instruction, and guidance to its members. (*Id.* ¶¶ 6–7.)  During the pandemic, Plaintiff GAE's advocacy extended to specific and general concerns with pandemic response, virtual learning, safety, and educators' rights and duties under their contracts. (*Id.*)  Plaintiff GAE issued material and guidelines for teachers about Covid-19, worked to increase teachers' access to decisions on reopening, addressed needed safety responses, established a clearinghouse, and worked on the rights and roles of teachers in the pandemic. (*Id.* ¶ 7.)  Plaintiff GAE used its time and resources to counsel members, provide training, support, and advice, and respond to challenged policies. (*Id.* ¶ 8.)  Plaintiffs argue GAE's time and resources are being "diverted from other initiatives and issues" and "would otherwise be available for other actions and support for its members" if not for the Agreement. (Dkts. 28 ¶ 8; 36 at 17–18.)

Plaintiffs previously submitted, and now rely on, the declaration of GAE's Legal Services Director and General Counsel, Michael McGonigle.

(Dkt. 14-1.)   Mr. McGonigle testified by declaration that GAE Legal Services Program operates to protect its members' employment rights and funds litigation on behalf of members.  (*Id.* ¶ 2.)  Mr. McGonigle has received calls from educators in Fulton County about the Agreement, reviewed the Agreement, and objected to it.  (*Id.* ¶¶ 5–6.)  He has had discussions with members working at FCSD and reached out to Defendant's counsel to propose a more limited waiver.  (*Id.* ¶ 7.)  Mr. McGonigle testified that Plaintiff GAE has received several calls and requests for assistance related to the Agreement and GAE UnivServ Director Michael Sears has worked with members to find individual solutions to problems from the Agreement.  (*Id.* ¶ 8.)  He stated, "GAE has worked tirelessly to support these members as they navigate this unnecessary complication of returning to work during the pandemic." (*Id.*)  Mr. McGonigle also testified "[s]ince GAE's mission is to support educators and advance the quality of public education in Georgia, [he] authorized a lawsuit in support of educators and the organization."  (*Id.* ¶ 9.)

Defendant contends Plaintiffs have not plausibly alleged diversion of resources because they rely on conclusory allegations.  (Dkt. 33-1 at

13.)  Defendant argues Plaintiffs' allegations neither show Plaintiff GAE dedicated substantial resources from its regular activities to counteract the Agreement nor establish that opposition to the Agreement caused a concrete, demonstrable injury to Plaintiff GAE's organizational functions or a drain on its resources that impaired its typical projects.  (*Id.*) Plaintiffs contend GAE's time and resources are being diverted from *other* initiatives, issues, and action. (Dkts. 28 ¶ 8; 36 at 17–18.)  Plaintiffs claim GAE's leadership held information sessions with members, GAE Office of Legal Counsel investigated the legality of the Agreement and sought to engage Defendant in a negotiation, and allocated "scarce resources, . . . diverted from other initiatives and issues to the [w]aiver." (Dkt. 36 at 17–18.)

Plaintiffs' allegations, along with Mr. McGonigle's declaration, fail to explain what activities Plaintiff GAE diverted resources away from to spend additional resources addressing the Agreement.[14]  They are, in

---

[14] Plaintiffs rely on *Common Cause/Georgia v. Billups,* 554 F.3d 1340 (11th Cir. 2009); *Browning*; and *Hispanic Interest Coalition of Alabama v. Bentley*, 691 F.3d 1236 (11th Cir. 2012).  (Dkt. 36 at 16–17.)  These cases are distinguishable since Plaintiffs failed to provide the Court with any indication as to what GAE activities were impaired.  In *Billups*, the president of the Georgia chapter of the NAACP testified that a statute

fact, conclusory and insufficient. *See Jacobson*, 974 F.3d at 1250 (relying on testimony from the director of campaigns for the Democratic Congressional Campaign Committee and the chair of Priorities USA, the court held no plaintiffs proved injury in fact because the court could not determine what activities, if any, might be impaired by the organizations' decisions to reallocate resources); *see also Walters v. Kemp*, No. 1:20-CV-1624, 2020 WL 9073550, at *6 (N.D. Ga. May 5, 2020) (finding the plaintiffs failed to establish standing based on the diversion-of-resources theory because the court did not know "what activities, if any, might be

---

would have an effect on the voter registration efforts by the NAACP because it would have to divert volunteers and resources from "getting [voters] to the polls" to helping them obtain acceptable photo identification. 554 F.3d at 1350. In *Browning*, the court found that instead of "abstract social interests," the plaintiffs averred that their actual ability to conduct specific projects, such as registration drives and election-day education and monitoring, during a specific period will be frustrated. 522 F.3d at 1166. In *Bentley*, the Executive Director of plaintiff Alabama Appleseed, John Pickens, submitted declarations to explain how H.B. 56 affected and will continue to affect his organization. 691 F.3d at 1243. Mr. Pickens testified: scheduled meetings and outreach trips on immigration-related projects were cancelled or redirected into a know your rights presentation on H.B. 56; responding to calls diverted time from core work on immigration-related projects; investigation of poultry processing plants was severely impacted, including scaling back the number of surveys; and Welcoming Alabama work had been complicated, including postponing work in many communities. *Hispanic Int. Coal. of Ala. v. Bentley*, No. 5:11-cv-2484-SLB, Dkt. 37-6 at 6–8 (N.D. Ala. July 21, 2011).

impaired by the organizations' decision to 'expand and divert resources'" because of the defendants' conduct).  Although resource diversion is a concrete injury, those allegations must be backed up with specific allegations of the neglected or impacted activities or endeavors. *Jacobson*, 974 F.3d at 1250; *but c.f. Havens Realty*, 455 U.S. at 379 (there was sufficient proof of diversion of resources because the defendant's actions frustrated the organization's efforts "to assist equal access to housing through counseling and other referral services" and forced it to divert the resources to counteract the unlawful practices).

Because Plaintiffs have failed to explain what activities GAE diverted resources away from, they have failed to establish Plaintiff GAE has standing under a diversion-of-resources theory.  It also appears much of Plaintiff GAE's efforts were based on its misunderstanding of the Agreement and perhaps misleading advice to members as to the impact the Agreement might have on them.  The complaint contains no allegations as to the resources Plaintiff GAE diverted with respect to the actual limited scope of the Agreement.  Plaintiff GAE may not rely upon the diversion-of-resources theory to establish standing.

An organizational plaintiff also has standing to enforce the rights of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. Defendant contends Plaintiff GAE cannot satisfy the first or third prong. The Court agrees that Plaintiffs cannot meet the third prong because—in the light of the Court's determination that it lacks jurisdiction over any declaratory or injunctive claims—the remaining claims seek damages which require participation by individual members. *See Self-Ins. Inst. of Am. v. Korioth*, 53 F.3d 694, 695–96 (5th Cir. 1995) ("Though an association may have standing to seek a 'declaration, injunction, or some other form of prospective relief' on behalf of its members, it does not enjoy standing to seek damages for monetary injuries peculiar to individual members where the fact and extent of injury will require individualized proof." (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *Warth*, 422 U.S. at 515 ("[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief

sought."); *The Ala. Dental Ass'n v. Blue Cross and Blue Shield of AL, Inc.*, No. 205-CV-1230, 2007 WL 25488, at *10 (M.D. Ala. Jan. 3, 2007) (disposing of three counts because the plaintiffs pursued only compensatory and punitive damages).

As currently pled, Plaintiff GAE does not have associational standing and must be dismissed. As discussed above, Plaintiffs misunderstand the scope of the Agreement and cannot obtain equitable relief because there is no reasonable likelihood the Agreement will be reimplemented. If Plaintiff GAE believes it has standing under these constraints, it can reallege organizational standing under a diversion-of-resources theory.

## III. Failure to State a Claim

### A. Legal Standard

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* This requires more than a "mere possibility of misconduct." *Id.* at 679.

In making this plausibility determination, the court must "assume that the factual allegations in the complaint are true and give the plaintiffs the benefit of reasonable factual inferences." *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010). But the court need not credit "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). In other words, "labels and conclusions" are disregarded, and "formulaic recitation[s] of the elements of the cause of action" are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## B.  Discussion

### 1.  ADA and Section 504 Claims[15]

In Count One, Plaintiffs allege Defendant violated the ADA and Section 504 of the Rehabilitation Act.

---

[15] Defendant argues IDEA exhaustion bars Plaintiffs' ADA and Section 504 claims. (Dkt. 33-1 at 21.) The Supreme Court discussed in *Fry v. Napoleon Community Schools*, 137 S.Ct. 743 (2017), when a plaintiff must meet these exhaustion requirements for conduct prohibited by both

"Title II of the ADA and § 504 of the Rehabilitation Act forbid discrimination on the basis of disability in the provision of public services." *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).   Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

---

the ADA and IDEA.  137 S. Ct. at 748.  The Court found the plaintiffs need not exhaust the IDEA's administrative requirements if the gravamen of the "suit is something other than the denial of the IDEA's core guarantee—what the Act calls a 'free appropriate public education.'" *Id.*  The Supreme Court explained how to determine whether the gravamen of the complaint falls under the IDEA:

> One clue to whether the gravamen of a complaint against a school concerns the denial of FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions.  First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id.* at 756.  If yes to both, then the IDEA's exhaustion requirements do not apply, and the plaintiffs can sue under the ADA or the Rehabilitation Act.  *Id.*  If no to either, then the IDEA's exhaustion requirements apply, and the plaintiffs cannot sue until they exhaust these requirements.  *Id.*  Plaintiffs argue their claim does not seek free appropriate public education ("FAPE"), is not specific to students or to school, and the gravamen of the claim relates to the illegal bargain imposed on educators.  (Dkt. 36 at 20.)  The Court agrees.  Plaintiffs' claim is about Defendant trying to impair the IDEA process, not about FAPE.  Plaintiffs thus did not have to exhaust their remedies under the IDEA.

or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Under § 504, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  The same standards govern discrimination claims under the ADA and the Rehabilitation Act.  *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); *J.S.*, 877 F.3d at 985.

To prevail on a disability discrimination claim, a plaintiff must prove (1) he or she is a qualified individual with a disability, (2) he or she "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity," and (3) "the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *J.S.*, 877 F.3d at 985.  Plaintiffs appear to proceed with their ADA and Section 504 claim under theories of disparate treatment, disparate impact, and failure to make a reasonable accommodation.

Disparate treatment "occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of his [or her] disability." *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *4 (N.D. Ga. Aug. 24, 2007). Based on Plaintiffs' overly broad reading of the Agreement, Plaintiffs allege the Agreement singles out parents of children with disabilities and children with disabilities and impacts them solely based on their impairments. (Dkt. 28 ¶ 101.) Defendant contends Plaintiffs cannot show disparate treatment because the Agreement—as they correctly interpret it—applied to all employees, no matter if their children had disabilities. (Dkt. 33-1 at 24.) Disparate treatment "occurs when a disabled person is singled out for disadvantage because of his disability." *Wilf v. Bd. of Regents of Univ. Sys. of Ga.*, No. 1:09-cv-01877, 2012 WL 12888680, at *17 (N.D. Ga. Oct. 15, 2012). The ADA and Section 504 require "evenhanded treatment." *Medina v. City of Cape Coral, Fla.*, 72 F. Supp. 3d 1274, 1279 (M.D. Fla. 2014). The Court cannot determine whether there was evenhanded treatment since Plaintiffs' arguments are premised on their misunderstanding of the Agreement. The Court will, however, allow Plaintiffs to try to make out an ADA or Section 504 claim based on the limited waiver. Plaintiffs are correct that the Agreement

specifically required individuals to relinquish all claims arising under the IDEA.  But everyone had to waive all claims.  That may ultimately be fatal to Plaintiffs' claims.  But, Plaintiffs may attempt to reallege a claim under a disparate treatment theory based on the correct reading of the Agreement.

As to Plaintiffs' disparate impact theory, Defendant contends neither Title II of the ADA nor Section 504 permits a disparate impact theory.  (Dkt. 33-1 at 23 n.8.)  The Court disagrees as to the ADA.  *See Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 767 (11th Cir. 2020) (Title II of the ADA allows plaintiffs to pursue three distinct grounds for relief, including disparate impact) (citing *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016)).  To establish a prima facie case of disparate impact discrimination under the ADA, plaintiff must (1) identify the facially neutral practice or policy that allegedly had a disproportionate impact, and (2) provide statistical evidence showing that the challenged policy results in discrimination.  *See Pritchard v. Fla. High Sch. Athletic Ass'n, Inc.*, No. 2:19-cv-94, 2019 WL 1993511, at *5 (M.D. Fla. May 6, 2019); *Forsyth v. Univ. of Ala. Bd. of Trustees*, No. 7:17-cv-00854, 2020 WL 3129864, at *17, 19 (N.D. Ala.

June 12, 2020).  Defendant contends Plaintiffs' claim should be dismissed because they allege no statistical divide between Defendant's employees with disabled children and those without.  (Dkt. 40 at 19.)

Although the Eleventh Circuit has not directly addressed whether a plaintiff must present statistical evidence at the pleadings stage to establish disparate impact discrimination under the ADA, it has remarked, "when assessing disparate impact claims related to disability, it may not be necessary to provide statistical data." *Forsyth v. Univ. of Ala., Bd. of Trustees* (*Forsyth*), No. 20-12513, 2021 WL 4075728, at \*6 (11th Cir. Sept. 8, 2021); *Pritchard*, 2019 WL 1993511, at \*5 ("[W]hile statistical evidence is necessary to *prevail* on a disparate impact claim, it is not required to survive a motion to dismiss at the pleading stage."). The statute does not require statistical data at the outset of the litigation, and the Court thus refuses to impose that as a pleading requirement. The Court rejects Defendant's argument that Plaintiffs' ADA claim under a disparate impact theory must be dismissed.[16]

---

[16] The Court notes compensatory damages are, however, unavailable for disparate impact claims under the ADA. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) ("To prevail on a claim for compensatory damages under either the RA or the

Whether Section 504 allows a disparate impact theory is a more complicated question. Although the Eleventh Circuit has not addressed the question, it has twice assumed that a disparate impact claim is cognizable under Section 504. *See Berg v. Fla. Dep't of Lab. and Emp. Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1254 (11th Cir. 1998) ("[w]e will assume, without passing on the issue," that disparate impact claims are cognizable under Section 504); *Forsyth*, 2021 WL 4075728, at *6 ("We have never directly addressed the issue, and we need not do so here." (internal citation omitted)). Defendant, however, urges the Court to follow the Sixth Circuit's lead and hold that "a disparate impact theory is not available under the Rehabilitation Act." *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 242 (6th Cir. 2019). The *Doe* court focused on the text of Section 504 and compared it to other antidiscrimination statues. *Id.* It noted Section's 504's purpose was to bar discrimination "solely" by reason of one's disability—meaning, an

---

ADA, a plaintiff must show that a defendant violated his [or her] rights under the statutes and did so with discriminatory intent."); *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 235 n.5 (5th Cir. 2017) ("To recover compensatory damages for disability discrimination under Title II of the ADA, a plaintiff must also show that the discrimination was 'intentional' in the sense that it was more than disparate impact.").

employment policy must intentionally discriminate against an individual. *Id.* This purpose is different than prohibiting an individual being "otherwise adversely affect[ed]" by a policy. *Id.* The court explained that, when it "has found that a statute prohibits disparate-impact discrimination, it has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable,' which refers to the consequences of an action rather than the actor's intent." *Id.* (quoting *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 533–34 (2015)). "That language is missing from § 504, just as it is missing from Title VI." *Id.* The *Doe* court also examined the similarities between the language of Section 504 and Title VI, after which it was patterned, and could not reconcile how Section 504 could provide a disparate impact claim when Title VI does not. *Id.* The *Doe* court concluded that "[b]y any conventional measure, the text [of Section 504] leaves no room for the statute to prohibit disparate-impact discrimination." *Id.* at 243. The Court finds the *Doe* analysis persuasive and holds Plaintiffs cannot proceed on a disparate impact claim under Section 504. Plaintiffs are thus ***not*** allowed to reallege any Section 504 claims under such a theory.

A failure to accommodate claim "occurs when a covered entity fails to fulfill its affirmative duty to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability without demonstrating that the accommodation would impose an undue hardship on the [entity]." *Nadler*, 2007 WL 2404705, at *4 (internal quotations omitted). To establish a prima facie case for failure to accommodate, a plaintiff must show (1) he or she was disabled, (2) he or she was a qualified individual, and (3) he or she was discriminated against by way of the defendant's failure to provide a reasonable accommodation. *See Skotnicki v. Bd. of Trustees of the Univ. of Ala.*, 631 F. App'x 896, 903 (11th Cir. 2015).

Plaintiffs' arguments are again unclear because they are based on the incorrect interpretation of the Agreement. Plaintiffs seem to contend Defendant failed to make a reasonable accommodation for Plaintiff J.D.[17] (Dkt. 28 ¶ 113(ii).) Plaintiff J.D., through his mother, offered a modified waiver which struck the indemnification provision, removed the entire second paragraph, and changed the duration of the waiver. (Dkts. 28

---

[17] As discussed above, to the extent the Court has failed to accurately divine the complaint's intended meaning, the responsibility for that failure lies with Plaintiffs alone.

¶ 116; 28-1 at 49–50.)   Plaintiffs contend Defendant's rejection of the modified waiver was discrimination.  (Dkt. 28 ¶ 121.)  The Court cannot determine based on Plaintiffs' arguments and allegations whether there is a failure to accommodate claim based on the correct interpretation of the Agreement.  If Plaintiffs believe they requested modification of the Agreement premised on the correct interpretation of the Agreement, they can reallege a failure to accommodate claim.

### 2.    IDEA Claims

"The [IDEA] offers federal funds to States in exchange for a commitment to furnish a [FAPE] to children with certain disabilities." *Fry*, 137 S.Ct. at 746.  "[R]elief for the denial of a FAPE . . . is the only relief the IDEA makes available."  *Id.* at 752 (internal quotations omitted).   Plaintiffs admit they "do not seek appropriate educational services or FAPE" and concede their claims "cannot be resolved by adjudicating the 'impairment of FAPE.'"  (Dkt. 36 at 20–21.)  Plaintiffs do not dispute the adequacy of Plaintiff J.D.'s special education program or seek changes to "his IDEA services for his autism."  (*Id.* at 22.)  And Plaintiff Bendit neither alleges a FAPE denial nor seeks "compensatory educational service as a remedy."  (*Id.* at 22.)  The complaint also fails to

allege any facts suggesting the Agreement impeded a child's access to FAPE, hindered parental participation in the IEP process, or deprived a student of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii). Plaintiffs even allege Plaintiffs T.B. and Bendit continued to participate in the IEP process after Plaintiff Bendit signed the Agreement. (Dkt. 28 ¶ 130.) And it is insufficient to allege the Agreement may someday undercut the IDEA's procedural safeguards because a plaintiff is "entitled to substantive relief based on a procedural violation . . . only when that violation causes a substantive harm." *J.N. next friend of M.N. v. Jefferson Cnty. Bd. of Educ.*, 12 F.4th 1355, 1366 (11th Cir. 2021). A plaintiff must show a child's education "would have been different but for the procedural violation." *Id.* (quoting *Leggett v. District of Columbia*, 793 F.3d 59, 68 (D.C. Cir. 2015)). Plaintiffs claim no such difference. And, as explained above, the Agreement does not interfere with Plaintiffs' claims to a FAPE; it merely prevents claims based on the child's presence in the school building during remote learning.

Even if their relinquishment of IDEA rights is a procedural violation, there is no allegation Plaintiff T.B. received a different education because of that violation. Because Plaintiff Bendit signed the

Agreement, she actually got to supervise Plaintiffs T.B.'s and I.B.'s education. Plaintiffs thus fail to allege the educational opportunity Plaintiffs I.B. and T.B. received was substantially different from what they would have gotten in the absence of the Agreement.

As to Plaintiffs Nicholas and J.D., they never waived their IDEA rights, so there was no procedural violation.

The Court dismisses with prejudice Plaintiffs' IDEA claims.

### 3.    Contract and Unenforceability Claims

Plaintiffs allege the Agreement is unenforceable as against public policy and Defendant breached its duty of good faith and fair dealing in the performance and enforcement of its employment contract with Plaintiff Nicholas and those similarly situated. (Dkt. 28 ¶¶ 137, 139, 146.) Plaintiffs ask the Court to strike the Agreement and declare it unconscionable as between educators and Defendant. (Dkts. 28 ¶ 147; 36 at 32.)

Plaintiff Bendit signed the Agreement. Plaintiff Nicholas did not. Any claim as to the enforceability of the Agreement can thus only be brought by Plaintiff Bendit. But, as discussed above, Plaintiff Bendit does not have standing to obtain prospective equitable relief. And

Plaintiffs specifically seek declaratory relief.  (Dkt. 28 ¶ 147, at 69.)  The

Court thus dismisses with prejudice Plaintiffs' contract claim.[18]

### 4.    Right to Parent Claim

Plaintiffs allege Defendant violated their constitutional right to

parent by prohibiting their right to raise, safeguard, and make decisions

for their children.  (Dkts. 28 ¶¶ 148–61; 36 at 30.)  They claim the

Agreement

> illegally impinges on the fundamental right to parent by
> conditioning a parenting choice regarding education and the
> imposition of federal guarantees to appropriate specialized
> instruction on the parents need to return to work to
> financially support their families, and by stripping away the

---

[18] Plaintiffs allege Defendant breached its duty of good faith and fair dealing.  (Dkt. 28 ¶ 146.)  To state a breach of contract claim based on the implied duty of good faith and fair dealing, a plaintiff must show that the defendant failed to perform a specific contractual provision in good faith. *See Stillion v. Freedom Mortg. Corp.*, No. 1:14-CV-3956, 2015 WL 11439177, at *13 (N.D. Ga. June 16, 2015); *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1371 (N.D. Ga. 2006) ("[I]n order to state a claim for breach of the implied duty of good faith and fair dealing, a plaintiff must set forth facts showing a breach of an actual term of an agreement. General allegations . . . not tied to a specific contract provision are not actionable.").  Plaintiffs have not identified a provision in the Agreement or employment contracts that Defendant breached.  Without some nonperformance by Defendant, there can be no breach of contract claim premised on the duty of good faith and fair dealing.  *See Oconee Fed. Sav. & Loan Ass'n v. Brown*, 831 S.E.2d 222, 229 (Ga. Ct. App. 2019) (listing breach as an element of a breach of contract claim).

protected rights of the parent and of the child, which the parent must exercise.

(Dkt. 28 ¶ 153.)   They allege the tender of the Agreement unduly burdened their right to parent and teachers who signed the Agreement continue to be burdened.  (*Id.* ¶ 154.)

Parents have a constitutionally protected interest in the care, custody, and management of their children, including authority to direct the upbringing and education of children under their control. *See Troxel*, 530 U.S. at 65; *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982).  This right is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65.

Defendant contends "Supreme Court precedent firmly sets the limits of parental liberty," and Defendant has engaged in no conduct that infringes on a recognized parental right, so Plaintiffs' claim fails.  (Dkt. 33-1 at 29–30.)  Plaintiffs respond, arguing the Agreement impinges on their right to raise, safeguard, and make decisions for their children and "runs afoul of the strong majority rule that a parent may not prospectively waive a child's rights." (Dkt. 36 at 30–31.)  As discussed above, Supreme Court precedent recognizes parental liberty entitles parents to teach their child a foreign language, *Meyer*, 262 U.S. at 403;

to enroll their child in a private school, *Pierce*, 268 U.S. at 534–35; and to withdraw their high-school-aged children from school to provide vocational training, *Yoder*, 406 U.S. at 234.  Those cases all involve the state placing restrictions on *children's education*.  That is not what happened here.  The Agreement is about employment benefits of teachers.  The Court thus dismisses with prejudice Plaintiffs' right to parent claim.

### 5.    Title VII Claims

Title VII acts to shield employees from retaliation for certain protected practices.  The statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his [or her] employees or applicants for employment . . . because [the employee or applicant] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Generally claims of retaliation are evaluated under the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993).  To prevail, a plaintiff

must first establish a prima facie case of retaliation. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–01. To do this, a plaintiff must show: (1) she engaged in a protected activity or expression; (2) she received an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *See, e.g.*, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).

Defendant contends Plaintiffs' retaliation claim fails because Plaintiffs have not pled retaliatory causation and the Agreement is not a materially adverse employment action. "[A] plaintiff making a retaliation claim under [Title VII] must establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 899 (11th Cir. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). Plaintiffs fail to allege they engaged in any protected activity before Defendant instituted the Agreement—the alleged adverse action. This is fatal to Plaintiffs' claim.[19] *See Hopkins v. Saint Lucie Sch. Bd.*,

---

[19] Plaintiffs rely on an unreported Northern District of Illinois case, but that case is distinguishable. (Dkt. 36 at 34 (citing *Lester v. O'Rourke*, No. 17-cv-1772, 2018 WL 3141796, at *5 (N.D. Ill. June 27, 2015)).) In *Lester*, the plaintiff engaged in protected activity before his employer presented

399 F. App'x 563, 566–67 (11th Cir. 2010) (finding plaintiff's conclusory claim of retaliatory discharge insufficient to support a prima facie case of retaliation because he alleged no facts he engaged in a statutorily protected form of expression before being fired).  The Court thus grants Defendant's motion and dismisses with prejudice Plaintiffs' Title VII claim.

## IV.   Conclusion

The Court **GRANTS** Defendant's Motion to Dismiss.  (Dkt. 33.) The Court **DISMISSES WITH PREJUDICE** Counts II (IDEA), III (Contract), IV (Right to Parent), and V (Title VII).   The Court **DISMISSES** Count 1 (ADA and Section 504) but allows Plaintiffs to **AMEND** that count—in the precise manner explained above—and pursuant to the Court's legal interpretation of the Agreement.[20]   The

---

him with a prospective waiver.   2018 WL 3141796, at *4.   And the defendant in *Lester* threatened to fire the plaintiff "unless he surrendered all of his rights under Title VII in response to future discriminatory conduct."   *Id.*   Plaintiffs did not engage in protected activity before Defendant presented them with the Agreement, and Defendant's employees kept their jobs whether or not they signed the Agreement.

[20] Plaintiffs can only reallege ADA and Section 504 violations under disparate treatment and failure to accommodate theories.  They can also reallege ADA violations under a disparate impact theory but cannot reallege their Section 504 disparate impact claim as that theory fails as a matter of law.

Court **DISMISSES** Plaintiff GAE but allows Plaintiffs to **AMEND** if Plaintiff GAE believes it has organizational standing subject to the Court's dismissal of all equitable claims and the Court's legal interpretation of the Agreement.  Accordingly, the Court **DIRECTS** the Clerk to terminate Plaintiff GAE from the case.  The remaining Plaintiffs shall have thirty (30) days from the date of this order to amend their complaint pursuant to the Court's instructions.  The Court **DIRECTS** the Clerk to submit this matter after the expiration of the deadline.

 **SO ORDERED** this 23rd day of June, 2022.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE